Case number 12-3050NL, United States of America v. Kenneth Benbow Good morning, and may it please the court. My name is Matt Kaiser. I'll be arguing the first issue for today's meeting. Whether Agent Hanna's testimony was improper and second that that error was not harmless as to Kenneth Benbow, I'd like to ask for five minutes for rebuttal. We'll do rebuttal after the government's argument on this issue, then we'll go to conspiracy and do another rebuttal. Thank you, Your Honor. I appreciate that. The government's conceded error for a lot of Agent Hanna's testimony, and so what I'd like to do first is talk about some of the testimony where they have not conceded error because I think they're not right about that. But first, let me kind of set the background just a little bit. This was a case that went on for six and a half, seven weeks, as this trial did. Over the course of the investigation, there were 6,171 recorded calls. About 100 of those came into evidence, and Agent Hanna, during the course of the trial, interpreted for the jury, told the jury what those calls meant. And this was deeply problematic because I think as a lot of people recognize during the course of the trial, exactly what the calls mean is really difficult to understand. So with that, I'd like to start talking about one of the calls. On January 19th, there was a call between Mr. Benbow and Mr. Cray. Mr. Benbow is, of course, my client. Mr. Cray is the, I think, sort of apex of the alleged conspiracy. Where Mr. Benbow says, I'm quoting, this is from the Joint Appendix 2568. Mr. Benbow says, Back to come to you right quick, grab him, and then I'm going to put him up, and then I'm coming back and give you, yeah, in like ten minutes. And Mr. Cray says, I don't understand that. I think quite reasonably. Agent Hanna testifies that it's clear what Benbow wants to do here, that he's got an order of operations for how he wants to run some errands, contrary to Mr. Cray's contemporaneous lack of understanding. And moreover, in the part I just read there, when Mr. Benbow says him, him is a reference to cocaine. And the reason for that is because the government says when they talk about cocaine, they use the word Joe. And so whenever Joe appears, that means cocaine. This is, I think, to get to Agent Hanna's interpretation of this call, you've got to make a couple of inferential steps. You've got to first believe that Joe equals cocaine, and then you've got to believe that Joe means him, that any time someone uses a male pronoun, he or him, they're talking about Joe, and then in turn they're talking about cocaine. That's the inferential stuff that's not supported by the call that's later, but let's back that up. If you'll just indulge me a second more. There's a second call from a little bit later where Mr. Cray says, I'm going to try to see Joe again, and then a little later on says that he is giving the green light. This is at JA 2571. The government, after much conversation with the district court, objection says, look, we'll shore this up. We'll play the underlying tape so that the jury can hear that, so that the jury can understand that Joe means cocaine and cocaine, sorry, that cocaine means Joe and that Joe means him, and so any time we're talking using the male pronoun, he or him, we're talking about cocaine. And what they play is a tape. This is at the JA at 1210 where, I'm sorry, I forgot one step back there. Agent Hanna then testified that, again, in that call, they're talking about cocaine because they're talking about he and they're talking about Joe. The tape they play to support that is a tape where apparently there's a musician named Yo Gotti, and he was arrested for possessing cocaine and marijuana. So Prey says Yo Gotti got busted for cocaine and marijuana. Mr. Benbow says Joe and marijuana. And Prey says right. And from that, the government believes that establishes this two-step inference that cocaine equals Joe and Joe equals him. But that's just not right. I mean, the touchstone of lay opinion testimony, this is Williams, this is Hanson, is you've got to show your work. If you're going to tell the jury this is what phrases mean, you've got to show, and it's lay opinion testimony, not expert testimony. It's testimony from this case and this investigation. You've got to show, you've got to play for the jury the underlying tapes that allow the agent to make that inference. You've got to basically show your work the same way any elementary math student does. Here, they didn't show the work. What they showed is that first inference, Joe equals cocaine. They didn't show that second inference, Joe equals him, that any time you talk about him or he, that's a reference to cocaine. And actually, Joe is a pretty convenient word to use here because we all know it from, like, getting a cup of coffee, right? If I say get me a cup of Joe, everybody understands me to be saying get me a cup of coffee. But if someone brings me coffee and I say he's hot, that doesn't make any sense. It doesn't make any sense grammatically. It doesn't make any sense semantically. No one understands the phrase he's hot as a colorful, meaningful way to talk about the temperature of coffee. So I think for that reason, this testimony is error. And more importantly, it's really fundamental bad error because, of course, agent Hannah's testimony from these, I think, largely unintelligible calls is that they're all about cocaine. And any time she's saying he, especially between Mr. Binbow and Mr. Prey, is a reference to cocaine, that's both improperly opinion testimony, it's not supportive, and it's deeply prejudicial. Let me talk about one other bit of testimony. Give me a second. I'm getting a vertical. Mr. Prey, in a call on January 18, 2010, is explaining to another individual, Robert McMillan, he says, the job's coming, wrapped up, sealed up, and all of that. This is at JA 2554. The case agent, agent Hannah, is asked, this is JA 1175, do you have an opinion from your work on this case in your experience what they're talking about, what they're discussing? And agent Hannah says emphatically, they're talking about cocaine. She's asked, you know, can you tell more about that, explain more about that, and she says, when he says the joint wrapped up, sealed up, and all of that, that indicates to me that a large quantity of narcotics, and in my experience, kilograms of cocaine are often wrapped and sealed tightly in terms of their packaging. Now, the government argues this is proper expert testimony, and that she could have been qualified as an expert, and under Smith, this court has held, and if I may invite your honor, that if someone could have been qualified as an expert, that's harmless error. I think that doesn't apply here because of the Williams problem. I think for this, when you've got this blend of... The two-headed problem. The two-headed problem, exactly, your honor. Thank you very much. The touchstone of Hampton, the touchstone of Williams is really jury confusion. And here, when she's explaining that, when the agent is explaining that, you know, what she's saying is, this is lay opinion testimony, and moreover, this testimony is coming from my deep investigative experience in this case. And I think when you look at Hampton and Williams, that's the line. You can have lay opinion testimony where you're testifying about what happened in this case. You can have expert testimony where you're talking about what happens from, you know, an agent's experience in general or from past cases. What you can't have is someone who is an expert in this case. That's improper. And what the agent is telling the jury here is, I am an expert in this case based on my experience in this case, and as a result, I can tell you from that experience in this case that this is how this works. So your theory, then, is in this case, even if some of the so-called lay opinion testimony is called a two-headed situation and the mental gymnastics that calls, that requires of the jury, that all of this testimony by hand was improper, right? Is that your theory? I don't know that it's quite that broad. I mean, I do think there are – I think this is a response to this one bit of testimony that the government defend saying that it was harmless under Smith because it could have been an expert testimony. She could have been qualified as an expert, and had she been qualified as an expert, this would have been proper. But under Lillian, that doesn't make any difference, right? Absolutely. So that's why I'm asking you, is your – are you arguing that we should just disregard all the HANA testimony and then go on to the harmless error question? Yes, Your Honor, basically. I don't mean all the HANA testimony. That can't be your theory, right? Well, and there's proper – there's proper testimony in there. I'm hard-pressed to find what is proper testimony in here. I mean, not all of her testimony. All of her testimony, I think, where she's interpreting the calls. Right. I mean, obviously, if she's saying – I don't know. She's authenticating a document. Of course, that would be a crazy argument. I'm not making that crazy argument. I do think – I wouldn't say that the two-handed problem is the reason why all of the testimony is wrong. Some of it's merely improper lay opinion testimony. You know, I think the reason it's improper depends slightly on the nature of the testimony because, you know, it could be a seven-to-one problem. It could be a seven-to-two problem. It could be the two-handed jury confusion problem that they talked about in Williams. Well, you said the problem is, in essence, that she was testifying as an expert in this case. So lay opinion testimony is permissible from an agent like this. And your point is that when they state a conclusion without showing their work, is that what you're referring to when you say expert in this case? Yep. That's right. But if they showed the work, then it would be okay. Look, if there's another call out there where the agents – where the people are talking and they say, you know, cocaine means Joe, and let's refer to Joe as my Joe, let's make Joe into a character that walks through our halls, and they could play that tape, sure. That would be different, right? That would be better. But the problem is here they don't have that tape. What they've got is instead agent Hannah just saying, you know, look, I listen to everything, and this is what Joe means. This is what he and him mean. Maybe this is blending into harmless error, but it seems that for some of the what the, quote-unquote, lay opinion testimony that you say expert in this case, after you've been through a lot of these conversations and hear from the live witnesses who are also talking about what a lot of these terms and names mean, that you're not left with a whole lot where Hannah is the key. I think that does blend into the harmless error. I think that is basically the harmless error question, which I'm happy to talk about, of course. But, you know, if you strip out the improper opinion testimony, if you strip out agent Hannah's improper testimony, what are you left with? And, of course, the calls are still there. And there was a lot of argument and closing argument, opening argument, closing argument in particular about the contents of those calls. It came up, yes. Yes, there was. You know, the defense counsel saying listen for yourself here is what that one murder, and there's a lot of debate about that. And, I mean, Hannah wasn't the key to that. It was telling the jurors listen to it yourself. Well, I think, you know, respectfully, those are not my guys' problems. Yeah. You know, my colleagues over here. I know. I'm just talking about in general, as a general proposition, a lot of the problems you identify correctly under our precedent, and the government concedes some of that is, I don't want to say taken care of, but some of it arguably is taken care of for the jury by the other witnesses who are testifying as to the names, the codes, the terms. And, therefore, Hannah is kind of icing on the cake for some of that. Some of it is, but, frankly, I think as to Mr. Binbow, to move to that to respond to your question, I think he is in a radically different position. Okay. I mean, when you look, the only kind of non-law enforcement, non-rental car document authenticating witness on Mr. Binbow is Mr. Travers, just the one cooperating witness. But he's a big problem. Yeah. He's a big problem. Sure. If the jury believes him. If the jury believes him. I mean, a lot of this is going to be, does the jury believe some of these cooperators? Well, but, again, I think the harmless error standard. I know you're going to talk. I don't want to interrupt. I'm immersed in this discussion. Cool. So, I think the harmless error standard is not sufficiency of the evidence. Right. It's a higher standard. I agree. When you look at. Does it boil down to if we have any doubt? Yes. That's all it is, right? If we have any doubt, if the court has any doubt, it's not harmless. Right. I think that's a good, quick way to say it. And I think on this record, there should be doubt. The only thing that ties Mr. Benbo to this conduct. I shouldn't say the only thing. The largest, biggest thing that ties Mr. Benbo to this conduct, the conspiracy to the RICO, is Mr. Travers. And Mr. Travers, I think, as a witness, is, again, this isn't a sufficiency challenge. If this was a sufficiency challenge, I would be with you that I lose. But, assuming that's what you would say. This is a harmless. Is it actually beyond any doubt? Because I thought that there was a difference between constitutional harmless error and non-constitutional harmless error. And with constitutional harmless error, the government has to show harmless beyond a reasonable doubt. With non-constitutional harmless error, the government still has the burden, but it's to show that there was no substantial effect. That's right. The government has the burden. Although, I think, you know, I'm looking at Williams at 1161, where the Williams court says, any risk that it isn't harmless then means it isn't harmless. I think it's a little tricky when you're paraphrasing. I like the way Judge Dale said it. I'm sure. We'll see if the government agrees with that. Going back to your point about the drug conspiracy and Travers, even if there is some doubt about Travers, they had other evidence. They had this intercepted call referring to BBD special during the drug deal. Another witness just says BBD is Benbo. Benbo was arrested with significant quantities of crack. Why is there enough for that? Well, I would disagree that he was arrested with significant quantities of crack. I mean, I assume what you're talking about is the infinity stop. And this is interesting. When you look at this in the context of the conspiracy of the counts one and two, what you've got is that Mr. Benbo is standing outside a car with two people who aren't anywhere else in the case. They're not alleged to be co-conspirators. They're just like sort of random strangers. And the officer comes up. Mr. Benbo gets in the car, drives off. The car is crashed a few blocks away. And in that car there are six grams of crack, a little bit more than six grams of crack. Six grams of crack, when you look at the record in this case, there's no testimony that's a distribution amount. There's a digital scale with it, and the government makes a lot of that. But that on its own, those are the only drugs tied to Mr. Benbo, and they're not even on his person. They're in a car that he's related to, and we know there's another passenger in the car. I'm not sure that, you know, if this were a constructive possession case tried in D.C. Superior Court, the government would win that on that count alone. So it's, you know, what's remarkable about this is Mr. Benbo is convicted of a conspiracy to distribute PCP, cocaine, and marijuana, and at no point is PCP, marijuana, or cocaine found on his person. And part of this lays into the multiple conspiracies argument my colleague will talk about. But I do think for harmless error, this is a remarkably weak case as to Mr. Benbo. For that reason, there are a few strands that the government ties together on the conspiracy. But I think once agents have... What about the traverse testimony? Your argument about traverse testimony is just that that testimony is subject to dispute. Well, I think it's subject to dispute. There are standard concerns about any cooperating witness. He's cooperating, he's got a motive to tell a story that's going to get him time off. But again, your rule, I doubt your rule, or maybe it is, is that if the only evidence left is a cooperating witness, then by definition it's harmful. No, I think that would be a hard sell. Yeah. I mean, I think it depends on the nature of the cooperator, right? So if you had a cooperator who's doing active cooperation, I think that would be different than here. What we've got with Mr. Traverse is really a guy who was locked up, so he couldn't go out and do active drug deals. He wanted to get his sentence down, and so he did the only thing he could, which is he talked. And he gave historical testimony. He doesn't give specific dates, he doesn't give specific, it's just like an autobiography of his time in crime, you know, allegedly with Mr. Bimbo. With Bimbo, his half-brother. Absolutely. And there's, you know, I see the half-brother, the family connection. I can see how one could look at that as having some import. But really, the guy is in desperate straits. He's got quite a career, quite a resume, as somebody who's involved in the criminal justice system. I think this is meaning, Traverse testimony is meaningfully different than somebody who was doing active cooperation, was able to give specifics about individual drug transactions where I can say, you know, yeah, on September 13th, I went out with so-and-so. It really is very, very broad and kind of desperate cooperator testimony. I think it's of the weaker kind of cooperator testimony. And for that reason, I don't think that's enough to meet the harmless error standard. This is leagues away from the overwhelming evidence cases that the government decided for this. Let me ask you about the Johnson murder. So, in that case, most of the evidence for the Johnson murder was collected prior to the wiretaps. So, the wiretaps couldn't be the problem. And the evidence that was pre-wiretap is, you know, Traverse again. You've got his testimony. But that was corroborated by Robinson. And you've got all the rental shop records. Well, so, a couple of things. First of all, if you look at the way the Johnson shooting was charged, right, it's in furtherance of the racketeering enterprise. So, if count two falls because there's not sufficient evidence because of the problems with the testimony from Agent Hanna, then the racketeering enterprise falls. The conclusion is a racketeering enterprise. And then the count four, which is the Johnson shooting, falls. I hope I said that clearly enough. So, for that reason, look, if Hanna's testimony infects the racketeering enterprise and there's no enterprise, then count four is gone. The charges in the Johnson murder is gone. It happened in Maryland, and so it couldn't be charged as a D.C. code offense in this court. So, that resolved that. But I do disagree, Your Honor, about the state of the evidence with respect to the Johnson shooting. Uh-huh. You tell me why. That's why I asked you a question. Sure. I think I would go back to Agent Hanna's own testimony, right? When she was asked, why did Detective Doherty go to talk to Mr. Benbow's girlfriend? And she said, because we had a wire up and I wanted to get some calls. I wanted to see what they would say. Trapper's testimony was, you know, I think what it gives you is Mr. Benbow as, at best, an accessory after the fact. Somebody knew about the car, somebody who was trying to help out perhaps Mr. Prey with the car in the aftermath. I think that explains the Avis document. The reason Trapper's testimony becomes a problem there is because of another improper opinion testimony from Agent Hanna. She is at, there's a call. And in this call, this one's at 2645 in the J.A., Mr. Benbow calls Mr. Prey shortly after his girlfriend is approached and says, you know, a bunch of stuff. Talking about the joint was under their name or some stuff, paraphrasing, from the rocks, or whatever, or something, something, something. Mr. Prey says, again, pretty reasonably, man, I can't even interpret. And then Mr. Benbow goes on to say, look, that games to grill, man. Agent Hanna testifies that that games to grill, the J.A., 1939 to 40, that games to grill means that games to is cooperating. Because apparently, grill refers to mouth, and cooperation is, I guess, of the mouth in the same way that, like, al dente pasta is to the teeth. And she has this, you know, like quite literary interpretation of what games to grill means. But, again, if that's lay testimony, the government's got to show its work. There's nothing there that says this is how people talk about grills, this is how people talk about cooperation. It's simply not supported by the underlying facts that would be necessary to get this, to get that testimony, that opinion testimony proper. And, moreover, this is pretty damning testimony, right, this interpretation of the call, because what it says is that agent, it says that Benbow and Prey are worried about Travers and what Travers would be saying if he were cooperating. That does a lot for the jury to bolster Travers' testimony with respect to the Van Johnson shooting. It isn't there if you're just looking at what's independently corroborated by Travers. One other point on harmless error I'd like to make before I sit down, seeing I'm almost out of time, is the, you know, really, I think, overwhelmingly when you look at why this is charged as a conspiracy, or why this is, I'm sorry, why the jury looked at this as a conspiracy in count one or an enterprise in count two, what you have is everything is tied together by agent Hannah's testimony, by her interpretation of those calls. When you distill out that and you're just left with these disparate facts, you're just left with the calls themselves that I think are unintelligible. Even the prosecutor can see that a normal person listening to these wouldn't understand what they mean. Mr. Cohen does it in the course of one of his arguments at 1174. I think what you're left with is that there's just not enough to meet the harmless error standard as to the entirety of the conspiracy. The drugs that were in his car the day he was arrested? Respectfully, I believe you mean the Infinity? Yeah, I mean, I think I talked about this earlier where they weren't, you know, again, they're not on his person. It's a, you know, it's a constructive possession argument. Okay. So that's, got it. Thank you very much. Thank you. Thank you. Good morning, Your Honors. May it please the Court, Deborah Persico on behalf of Appellant Alonzo Marlowe, and I'll be arguing the prejudice prong of the Agent Hanna argument on opinion testimony for Mr. Marlowe. So in order to understand why we suggest that all of Agent Hanna's improper opinions should result in reversal of all of Mr. Marlowe's convictions, we ask that you keep in mind two important points. One is conspiracy, and one is influence. As to the conspiracy, the heart of the government's indictment and its entire case against these appellants had to do with conspiracy. And not just the conspiracy counts, but that each of the substantive charges and the conspiracy, the government needed to prove a connection between these three men and the cooperators who were testifying. Now, if you keep that in mind and go to the second step of how Agent Hanna actually influenced this case, I'm going to ask that instead of being judges, you put yourself in the shoes of the jurors. Every time you hear a government witness who is substantially impeached with plea offers, with hopes of a benefit of a sentence, with lying, even with his own motive to commit murder, along comes Agent Hanna again, the agent that the judge has told you has superior knowledge, superior experience and skills. And in fact, she's so skilled that she has the inside track to what's going on, and you're not going to be privy to all the information that she has because she really knows a lot about this case. So you look at that and where you as jurors may very well have doubted the cooperators. Once you see Agent Hanna appearing and reappearing time and again and essentially telling you, here's what these calls mean so you can believe the cooperators, because essentially she's saying, I've worked on this case, I've seen lots of other evidence that you're not going to see, and here's how these calls should be interpreted. So our position is that you look at the overall case, that you cannot look at substantive charges or the conspiracies in a vacuum, because as Mr. Kaiser just said, Agent Hanna tied this whole case together with her opinions. And essentially what she did is she bolstered the cooperators' testimony, which jurors, normal jurors may have not credited had Agent Hanna not come in as an expert with superior knowledge telling you exactly what was going on. I thought the centerpiece of the case was the murders, and the murders were part and parcel of an overall business, a drug business. And how do you, going through the record and reading the closings, how do you show that? Well, it's difficult to show that unless you have insiders who are testifying as to the operation, unless you have things like GPS evidence that put people in a place at the time of the murder, and you have people who see him coming out after shooting someone with the gun and saying, don't say anything. You know, there's a lot of direct evidence that is very damning in this case, and the murders are the centerpiece, as I understood it, and why were these murders taking place? It was part of a business. Revenge, killing a cooperator. Why is that a wrong way to look at it, as opposed to Hanna being the piece that ties together? When I read the closings, I don't see them starting with, oh, Agent Hanna is the key. I see them starting with the murders. And you say to put myself in the shoes of the jurors. Well, the jurors are listening. That's what I would be listening to. Okay, but what the jurors have also listened to is not just direct evidence. They've listened to cross-examination. Yes. And every single one of these witnesses was substantially impeached with all sorts of things, and with inconsistency. What about McLeod? I'm sorry, Your Honor? McLeod, is that how you pronounce his name? McLeod. McLeod. McLeod. He wasn't a cooperator. Well, he had an immunity letter from the government.  The other thing with his testimony is that his description to the police of the shooter, whom he claimed was Mr. Marlowe, did not match the description of the other eyewitness, Holly Walker. Holly Walker, who was not impeached from here to Sunday with plea agreements or anything else, gave a different description than Mr. McLeod did of the shooter. In fact, her description matched what Mr. White was wearing at the time of Mr. White's arrest. The GPS data showed that he was there. And the GPS data was challenged. The GPS data was challenged. Don't forget this is, what, seven years ago or five years ago, this trial, and longer than that when they had the GPS. GPS was not as accurate as it probably is now. And what the expert admitted on cross-examination is that even the GPS signal is degraded by trees. The signal dropped. What about the anklet data also? Well, that's the GPS. That's the GPS. He was wearing an ankle monitor that had the GPS device. All of that was presented to the jury, right? And all of that was presented to the jury. I guess the question is, if all of that's presented to the jury, and then the jury makes a determination one way or the other, and this situation is adverse to your client, the question becomes, what role, what marginal, incremental role did the HANA testimony play in swaying the jury? And there's a case to be made that the substantial force of its admissions to the jury came from exactly the things you're talking about. You know, you should doubt, you should credit the GPS evidence, you should doubt the GPS evidence. You should credit McLeod's testimony, you should doubt McLeod's testimony. And one's left with the potential impression that that's what they were sifting through, not the role of the HANA. Well, I'm suggesting that they were sifting through that. But on top of all of that, they have the experienced, the knowledgeable, the skilled agents coming in time and again in between the testimony of impeached witnesses, suggesting by her interpretation of these calls that what the cooperators were saying, the ones that you just heard about that were all, you know, substantially impeached, it's okay to believe them because this is how you can interpret this call, which suggests that what he just said is true. In some cases you have other, and this is why I think this is tricky, you have other, like, work call, that phrase, which is, I think, 50 minutes before the Hodge murder. And you have testimony about what that means from not just from HANA. Exactly. But I think, Your Honor, you keep going back to the direct evidence. And what I'm trying to get you to take a look at is, and even the cases say this, you know, you look at whether there was room for doubt of a witness' credibility. And like Mr. Kaiser said, this is not a sufficiency of the evidence. I understand that. I agree with that. And just trying to sort out, as the gentleman said, the marginal increase that was provided by HANA. I mean, some of you just listen to these calls. Some of you would be unintelligible. Some of it, after you listen to enough of them, I assume you get a sense of what they're talking about when you have the direct witnesses also testifying about what some of the common terms are. And then HANA is permitted to testify about code word. She's permitted to be a code word expert in that. Well, a code word expert is not the only thing that she did though. I understand. She's interpreting, you know, entire calls. I mean, it got to the point where, I'm sorry. She's doing three different things. Expert. Yeah. She's lay opinion permissible. And then she's lay opinion making inferences which she didn't show her. I know because I was so carried away at one point that she's actually telling the jurors that what Mr. Marlow and Mr. Prey were talking about were their mothers. I mean, is that really necessary? This is why I say that her testimony had a lot of influence. You could see where it would have a lot of influence when all of the other witnesses were so impeached and contradicted. So that's what I'm asking the court to do is balance this in a way where, you know, if Agent HANA had appeared only once, this may not have the same kind of influence. But she's interwoven throughout the trial. So every time, like I said, every time you hear from a substantially impeached witness, she reappears and confirms for the jury that. This is kind of a side point. The way the case was presented was thematically right and so it was broken up and it just made sense instead of having her once. I get your point on that, though. She's a reappearing person. I think I'm out of time. You are out of time. Thank you very much. Okay. I'm going to pray to counsel. Good morning. I'd like to try to take the last shot at answering this question about what I believe is called the incremental effect that HANA had on this case. And in the time that I have, I'd like to focus on the five counts for what she had with respect to Mr. Pray, where she had the greatest influence and, of course, those are the ones where he would pass away in custody. They are count one, the narcotics conspiracy, count two, the Rico conspiracy. Now, there are three others and they are the murders in furtherance of those. But what I think I heard as this discussion took place is that this is a little backward. This case starts with a conspiracy, certainly in terms of those counts, that to read the words of the indictment, this enterprise, they allege Mr. Pray ran, was an ongoing organization whose members functioned as a continuing unit for a common purpose. If you don't have that, what you have is you have individual homicides done for different reasons. Well, another way to look at it is the case starts with dead victims, one of whom is a cooperator, one of whom is revenge, one of whom is the incident after the night out. And then you're trying to figure out what was going on with those murders. And what was going on with those murders, when you keep digging, is that it was part of an overall business, not a legal business, but a business. Right. And so when you say it starts with a conspiracy, I think it starts with the dead victims, I think. And then you say, well, why did this happen? What was going on? And that's why it's ultimately charged as a conspiracy. Well, just to make the math analogy, there's a lower common denominator for two of these murders. With Crystal Washington, you didn't want to be convicted, so that this individual was murdered. In the case of Van Johnson, that there was an alleged beef. But what makes this onerous is the fact that the motive for it was a conspiracy, that these murders were done, that these were not isolated things. They were done to further a business, an enterprise. The only way you get to that, because you can't have a common purpose and a common organization with these discrete acts. They have to be bridged together. The only way you can do that is through, well, conversations, talking. And that's what the era for Hanna was, because Hanna supplied the conspiratorial motive to all of this, separate and apart from the underlying facts. Count 4, of course, is the murder of Van Johnson. It was charged as an infuriation of Rico. Count 6 was Crystal Washington. But there's a Count 7, which is a DC murder violation. That's what you would do if a witness was murdered on the way to trial. That's the motive. But the government says, no, it was much farther than that. It was to advance a conspiracy. And that's the gap, and that's where there's the doubt. It erodes the doubt. Would you pose that as an either or? Can it be both? Well, yes. Because the business is going to end if the witness testifies and the people who are running the business are convicted and are incarcerated. That could be. But there's something more direct that happened, that Agent Hanna said in 100 calls that she testified. Every time she testified about the calls, what she was doing, and I think the court can ignore this, she was imparting to the jury. This is a secret organization, an illegal one. I have an insight into how it works, and I'm giving you a window into this business enterprise. Now, that was her role, and she did a good job. And with respect to Mr. Prey, Counts 1, 2, and then the three Rico murders, 4, 6, and 8, that is what really hurt him, and the other defendants too. It was done by Hanna because Hanna supplied the organization, the common purpose, the direction. It would not ordinarily exist with those acts. My final point is this. In, let's say, the 100 calls, take an arbitrary number. 50 of them are good and 50 of them are no good. How is it possible for an appellate court to say what calls influenced the jury, in terms of proving a conspiracy now, and what did it? Did they only select the valid calls, or did they select them all? That's an impossible task. Because it's impossible, there's a doubt. And that's why those convictions, with respect to Mr. Prey, Counts 1, 2, 4, 6, and 8. Just a comment. I mean, I think you're right. It's a very difficult task for an appellate court. But we're required to make the best of it. But I agree with you. Going through the record and trying to recreate what would have happened and what did happen and what influenced, and to Judge Trinivasan's question, that's very difficult. That means there's a doubt in our opinion. Can I just ask you one question, which is, so I get your argument about the murder accounts that are tied directly to the conspiracy. Then there's the freestanding murder accounts that aren't, like Count 7. And what's your point about that? Because I take it what you're saying is, if Hannah takes out 1 and 2, then the murder accounts... 4, 6, and 8 go. Yeah. What do you say about, like, 7, for example, which is Washington? We agree. I mean, essentially, I mean, Prey was not there, and her interpretation of the calls, of what he was doing, that doesn't... She's testifying to two things. In her acts, and then by implication, the conspiracy and the connection. And the, with respect to Washington and, of course, of Hodgins, she's directly intervening in what these calls meant right after. And it could be reversed on those grounds. But what is, I think, beyond any doubt, her testimony about the recode and narcotics conspiracy, that creates these homicides in furtherance of them, and those should be reversed along with California. Okay. Thank you. We'll hear from the government. Thank you, Your Honor. May it please the Court. Dan Leonard, State of the United States. I'd like to, if I may, address the defendants' arguments in the same order that they raised them. Which is to, at first, address which aspects of Agent Hanna's testimony were erroneous, and then to address the harmlessness. The defendants are wrong when they claim that everything that came out of Agent Hanna's mouth about the wiretaps was erroneously admitted. Agent Hanna was properly qualified as an expert in words and phrases used by drug dealers under Rule 702. And in many instances, she testified about the meaning of specific words, and identified as the basis for her opinion of the meaning of those words, her past experience, or the fact that it was commonly used, or some other reference to the fact that she was providing that opinion based upon her Rule 702 expertise, and not based upon what she learned from the wiretaps in this case. So in those instances, things like interpreting what decor is, or interpreting what work means, where she explicitly referred to her past experience, that was properly admitted under Rule 702. There were also very small amounts of proper testimony under Rule 701. As Mr. Benbow's counsel conceded, if the government's witness shows its work, and that is given to the jury, then it is proper lay opinion testimony under Rule 701. And this issue where Agent Hanna said that the defendants used the term Joe to mean cocaine was just that. She expressly testified that she was basing that opinion on a specific call. That specific call was played for the jury. And as Mr. Kaiser described, the defendants replaced the word cocaine with the word Joe. And, in fact, in that instance, Judge Collier explicitly instructed the jury that Agent Hanna might not go beyond what they had heard. And so the jury understood that it was to evaluate Agent Hanna's specific reference, or opinion that Joe meant cocaine, based upon the calls that were before it. I think there was maybe only one other instance we relied on in our brief of proper Rule 701 testimony, and that occurred early in Agent Hanna's testimony, where she's discussing an individual named Robert Smith, who told Mark Prey that he had to empty a joint out. And she opined that that meant he had to pour out a bottle of PCP. And she said that she was basing her opinion there on the fact that Mr. Smith had been arrested the night before with an empty bottle of PCP out of his seat. And, in fact, the officer from the Metropolitan Police Department who arrested Mr. Smith testified at this trial and testified that he had arrested Mr. Smith. Can I ask you this question? So part of what I take to be the lesson from our case is that led to the government's acknowledgement that at least substantial portions of Agent Hanna's testimony were problematic. There's this notion that it's difficult for the jury to keep track of the capacity in which an agent of this type is testifying, and there's the possibility for confusion as between 701 and 702. Within 701, we've seen evidence that indicates evidence that's otherwise known. So in light of that knowledge now and in light of the fact that the government has acknowledged that at least a reasonable portion of Agent Hanna's testimony is problematic, what would you do? What's the way that you present Hanna's testimony in a case like this that doesn't give rise to the need to get to harmlessness at all? That's a question you've been struggling with in my office, Your Honor, and my advice has been that you present it like you presented the Joe equals cocaine call, which is to play the call in which Prey and Benbow use Joe to replace cocaine, and then also play the other calls where they explicitly do it and then play the calls where they implicitly do it and allow her to give her opinion that, based upon that first call, it's her lay opinion that they're doing the same thing in the second call, or like they did it with the Robert Smith arrest, which is to say she explicitly says my opinion that he is describing emptying out a bottle of DCP is based upon the fact that he was arrested the night before emptying out a bottle of DCP, and then present testimony from the officer from the Metropolitan Police Department who arrested Mr. Smith, who saw him pour out a bottle, who said it smelled like DCP, who recovered an empty glass vial at his feet. I think that would be proper, so long as, I think, the two-headed witness problem, Agent Hanna would also not testify as the government's words and phrases expert. So you need two witnesses, right? You would need a second witness who would interpret 32nd Street to be 32 ounces. Is that the practice now, to have two witnesses in a situation like this? That's the advice I've been giving. I don't know if we've tried cases yet where this has arisen. So the issue is you need to have two witnesses, and then the lay opinion witness needs to show the work on connecting the underlying initial calls. I mean, in essence, these were two shortcuts that the government used. The law at the time hadn't frowned on that yet. That's correct, John. And to the degree that the two-headed witness problem comes into play here, it doesn't infect her proper Rule 702 testimony. The two-headed problem is that the jury would attribute undue weight to the lay opinion testimony because she's been qualified as an expert. So it doesn't run in both directions. When she properly testified as a Rule 702 expert, there's no undue influence that the jury would be giving to that testimony. And you think work call is 702? I believe in that context where she explicitly said that it was based on her past experience, that work call is 702. It's also harmless. Three different witnesses testified that work means violence. Travers testified to that, Benton testified to that, and White testified to that. White testified that Alonzo Marlowe was work call, meaning if somebody do something, Marlowe's going to kill them. So, and, you know. I mean, I guess then the question becomes to what extent do we anticipate, and this is, you know, Judge Kavanaugh was discussing the difficulties of an appellate court and putting ourselves in the position of trying to assess what the jury would have definitely understood even asked with the problematic evidence. Then the question becomes for an issue like work. Yes, it's true that it was mentioned elsewhere. To what extent would the jury make that association with respect to this call when at least there's one count that's entirely dependent on the call, on knowing that the call is connected to the conspiracy, and to what extent would we anticipate that the jury would see, okay, if I take out Hanna's testimony, which is obviously the most direct testimony about what work means in this particular context, would I otherwise know based on other stuff that's been presented in the course of a long trial that I can piece together that work now in this context must mean violence? So, in this case, I believe that Agent Hanna's testimony is probable 702. Right, you've got that argument. But for cases where that's... If we agree with that, that answers the question. But if we don't agree with that, then Judge Trinovasa... And I think in this case that the... As Judge Kavanaugh recognized earlier, when you read through the transcripts in this case and read through the call, it very clearly becomes apparent where Agent Hanna is defining her lay opinion. It is that the calls become clear and the meaning becomes clear in context, not of Agent Hanna's lay opinion testimony, but in context of all the other evidence in the case. And so I think in that respect, one can be fairly assured that the jury would likewise understand work to mean violence. In fact, Judge Collier followed up with Marvin Denton. That sounds like a 701 argument as opposed to a 702 argument. I thought your point about... It's a harmlessness argument. I think Your Honor asked, in cases where the opinion is not proper 702 testimony and we're conceding error, how can we be assured that the jury would have nevertheless understood the word to mean what Agent Hanna said it meant? And my response is that reading the transcripts serial and looking at the witness's testimony, much of what Agent Hanna testified to was already clear from the record itself by what other witnesses had said. And so the court can... One thing I noticed was that in the indictment, all the counts that relate to the calls talk about the calls as being partially coded. I think every single one of them says partially coded in the indictment, which indicates that somebody's got to tell the jury how to decipher the code. I think that's true, and the witnesses... Both Agent Hanna, the rule 702 witness, and the cooperators deciphered many of the calls. So Carlos Toliver, who was the PCP seller to Prey and Marlow,  and Lawson White, the person who gave Marlow the gun to kill Gerald Hodge, interpreted calls between himself and Prey. Marvin Benton, the person who testified that Prey was going to get Marlow to kill Washington, interpreted jail calls between himself and Prey. And then you had witnesses, those witnesses and others, testifying to the meaning of terms that they were using in trial. So they would refer to defendants, other co-conspirators by their nicknames, and the government would put up a photo of that person and identify them. Or they would say a thing like, Marlow was work called, and the government would follow up, what does that mean? It means he's going to kill somebody. Likewise with Marvin Benton, there was lots of follow-up as to what he meant by holding the guns or by work call. And so many of these phrases repeated themselves throughout the trial, thus rendering harmless any improper opinion testimony that Agent Hanna gave. Can I take you back to your point about 702? I mean, your point that, look, some of this witness, some of their testimony was clearly legitimate 702 testimony, right? So I'm looking back at my notes on Williams, and I take your point that the prejudice goes one way, right? The risk is that the fact she's an expert could confuse a jury about whether she has any expertise as a lay witness, right? But Williams seems to say the other problem was that the jury just couldn't tell when this witness was testifying as an expert and when he was testifying as a lay witness. I mean, that's true here too, isn't it? I suppose I have two responses to that, Your Honor. One is I believe that the district court required the government to have Agent Hanna testify that she was basing certain opinions on past experience as a way of signaling to the jury. But didn't we say that was not sufficient in Williams? The district court here, presiding over the trial, thought it was sufficient. In Williams, we said it wasn't. Even if it's not, it's still a one-way error issue. Because I think the implication in Williams is that they understood all of the testimony to be rule 702 testimony. And so that only infects the rule 701 lay opinion testimony. So I still think it's merely a one-way error. By one-way error, I just want to make sure I understand this. Do you mean that if the evidence was proper expert testimony, and she was qualified as an expert, then there's no error from the fact that she was also testifying as to some lay opinion testimony? Is that what you mean? Yes, Your Honor. And there's only one other issue that didn't come up in Appellant's opening argument, but was in the brief, which was Agent Hanna's testimony as to numerous conspirators' nicknames. I think that's proper factual testimony. She listened to calls in which people identified themselves by their nicknames. She interviewed conspirators after the case was taken down. They told her their nicknames. That's no different than them telling her their names. And it was also repeated throughout trial. Other defendants identified many people by their nicknames. So the nickname evidence that they referenced, specifically Travers being gangster, is proper factual testimony, but also harmless. As for the harmlessness argument, the defendants discount to an inappropriate degree the cooperator testimony in this case. This was, in fact, a murder case. It was a case about three murders that occurred over a two-year period. A conspiracy that was charged beginning in September 2006 that ended with a three-month wiretap. So it was a three-and-a-half-year conspiracy with a wiretap tagged on at the end. And the jewels of this conspiracy, the jewels of this case, were the three murders. As to Mr. Benbow, Mr. Kaiser, I think, calls Daryl Travers' testimony into doubt in a way that is completely unsupported by the record. If nothing else, this court can rest assured that the jury believed Mr. Travers because it convicted Prey and Benbow of murdering Van Johnson and attempting to murder Steven Robinson. If the jury had any doubt about Daryl Travers' testimony, they would not have convicted Benbow and Prey on those counts because he was the sole sort of eyewitness, if you will, to those murders. The court can also analyze Travers' testimony and the myriad ways in which it was corroborated in the slightest detail. He got everything right about the murders. The colors of the cars, where the murders occurred, how many guns were used, where Benbow parked the car after crashing it, fleeing from the scene, the fact that Johnson and Robinson were from 37th Street. Robinson testified to that. Johnson was wearing a 37th Street piece of jewelry on the outside of his clothing. He was right about where they got the car, who the car rental company was, the fact that when the car rental company brought a replacement car, it had an out-of-state license plate that Benbow didn't like, which Benbow returned that night. He was right about the fact that the car was rented by Benbow's girlfriend's mother. His testimony about these murders was corroborated in the smallest degree by the Avis records, by Benbow's phone calls, showing that he called his girlfriend, called 411, called a tow truck company, and then called Travers the night of the shooting. It was corroborated by Robinson's testimony, by the Avis records. And so not only can you be assured that the jury believed Travers based upon its verdict, but you can also analyze the testimony for yourself and see how incredibly trustworthy it was. And it was Travers who was the link between Prey and Benbow. He's the one who tied them together in a conspiratorial relationship. He testified that Prey and Benbow, that he and Benbow combined money to buy drugs between a quarter of a kilogram and a kilogram a week on average for months in 2006, and that during that time they bought drugs from Mark Prey. He testified that during that time Prey asked him to put cocaine into crack, and he did that for Prey. Travers then went to jail, and he got out two years later in July 2008. He said that Benbow and Prey were closer by that time, that they were like brothers, and that he and Benbow continued to buy and deal cocaine together. He said that he continued to, that once again Prey asked him to put cocaine into crack for him, and that Benbow in fact brought Travers the cocaine from Prey to Travers, that Travers tried to cook up in one location, it didn't work, so he went to a house on Eaton Road and did it again. And it was shortly thereafter that this Van Johnson murder occurred. The other evidence of Benbow's drug dealing that I think Mr. Kaiser misunderstood your question, Judge Kavanaugh, Benbow was found with crack on two different occasions. He crashed his Infiniti in March of 2008, and they found 6.2 grams of crack. But when the case was taken down... On the arrest day, too. On the arrest day they found 215 grams of crack. In the car. In the car. His car. And he calls it a constructive possession case. But there was lots of evidence that Benbow owned these cars that we didn't mention in our brief. Papers were found in the backseat of the Infiniti with Benbow's name on it. A transfer of money to Travers in the Bureau of Prisons was found in the back of the Infiniti when it was crashed. Travers testified that Benbow told him that he crashed the Infiniti when the police came and he was guilty, so he ran. That's exactly what happened. The police came. Benbow had a gun and crack in his car and he ran. He also had a digital scale in the backseat. Or, excuse me, in the trunk. And he had a handgun with rubber bands around the handle that his girlfriend or the woman who was with him threw from the car before it crashed. The rubber bands on the handle are significant because all other conspirators, including Mark Prey, in this conspiracy, had this distinctive feature of putting rubber bands around the handles of their handguns. The pistol found in Crystal Washington's house in September 2006 that she attributed to Mark Prey had rubber bands around the handle. One of the long guns was Marvin Benton's that was found in the house that day had rubber bands around the handle. When the case was taken down in March 2010, in Prey's duct work, they found yet another handgun that had rubber bands around the handle. The use of digital scales in drug dealing was readily apparent from the record in this case. Linda Battle testified that when Prey took over her house, he used scales. When the officer went into Crystal Washington's house and found Mark Prey seated at a table with PCP, marijuana, and crack, there was a digital scale. The prosecutor who testified as to what Ms. Washington told her said that when Mark Prey would call Crystal Washington, Crystal Washington said she would get out his drugs in the scale. Marvin Benton testified that he would buy drugs from Prey to redistribute between 3.5 and 70 grand. All of this shows that these amounts were drug dealer amounts of crack. All of these things drive Benbo to conspiracy. Benbo's wallet was in the car when the officers took the Honda in March 2010. The Honda was the car on the arrest day? On the arrest day with the 215 grams of crack. Mr. Hazard tried to minimize that by saying it's a constructive possession case. Officers had seen Benbo in the Honda going into Prey's apartment building in January. But officers also found Benbo's wallet in the car on March 11, 2010. In the Honda? In the Honda, yes. Do you have more questions on this subject? Can I ask you to go on to Prey and his conviction for the Hodgmer? Other than the Hanna testimony, is there any testimony or physical evidence linking them to that? So, yes. What is it? There are two things. One is the testimony that the prosecutor focused on in closing arguments was a snippet of the call that Agent Hanna said nothing about. It was about making the ball bounce yourself. And the prosecutor argued to the jury that that was Prey telling Marlo, you can do this on your own. You don't have to wait for Lamar Larkins. Agent Hanna said nothing about that testimony during her interpretation. But the more fundamental issue is that one, well, there's another issue, which is Prey argued in closing argument that he had nothing to do with that murder. He argued to the jury that he was in fact telling Marlo not to commit the murder during the course of that call. And the jury obviously rejected that. But it's a conspiracy case. And so Prey is independently responsible for acts taken, foreseeable acts taken in the presence of the conspiracy. It was plainly foreseeable to Prey that Marlo was going to commit this act of violence. First of all, this drug organization routinely committed acts of violence. But this was specific retribution for the shooting of Lamar Larkins, which was another close associate of Prey, someone who Prey bought wholesale amounts of cocaine with, as Marvin Benton testified. But in the closing, the government counsel said it was that conversation that makes the murder of Hodge reasonably foreseeable to Prey, the conversation that occurred, the phone conversation that Hanna described 50 minutes before the murder. Now, you say part of that conversation Hanna did not testify about, which is the ball, I think I'm getting that correct, the ball bouncing. Yes, in fact, much of the conversation she didn't testify about. There's conversation about Marlo poking the bat up top. Work call. Work call is part of that conversation. Work call is part of that conversation. She testified about that. Off the top of my head. Your point about that earlier was that that was expert testimony. It's our position that it's proper rule 702 expert testimony and that it's harmless because three different witnesses testified that work means violence. Okay. About that call, she never said. That call's key, even though you said, take a step back, this is reasonably foreseeable and further into the conspiracy. At least at closing, the government counsel said, well, the key to that reasonably foreseeable point is conversation. So the conversation's critical, right? The conversation is, but Agent Hanna's interpretation of that conversation was quite limited. She didn't say, they're discussing going to murder Gerald Hodge. She didn't give her understanding in the way that she gave her understanding of some of these other drug calls. She said, work means violence, loafing means not paying attention or being lazy, which was corroborated by Gerald Travers' testimony about the same thing. She said that, I believe she said that Squeak meant Lamar Larkins. That's the nickname. Right, and then the name, I guess he was getting voicemail. So she testified that when Marlo said, I've been calling Squeak's phone, it's going straight to voicemail, she testified that Squeak was Lamar Larkins. That's Larkins. Larkins wasn't around, and then Larkins, they do get, Marlo does get a hold of Larkins. Well, we don't know, but Larkins was at the scene. He's at the scene. But we do, but that was corroborated by the phone records. The government introduced Marlo's phone records, which show that right before calling Craig, he had twice called Lamar Larkins for calls that lasted something like four to seven seconds each. So I'm not sure I understand the conspiracy point that what we should be focusing on is reasonable foreseeability, because I thought the substantive counts with respect to Prey and the Hodge murder were 8, 9, 38, and 39. And those allege things like aiding and abetting murder, or using, I think a couple of them were 924C counts. But the counts weren't about whether it was reasonably foreseeable to Prey that a murder would happen. The counts required the jury to find substantive involvement with the murder. Or am I misunderstanding? You may not be misunderstanding. I was thinking of them as RICO predicates. The murders were also charged as RICO predicates. But weren't they actually charged as by-card counts and as 924C counts? And as to those, I think the theory was that Prey aided and abetted Marlo's commission of the murder. I'd have to look back at the indictment to see if aiding and abetting was – I know aiding and abetting was charged, but if that was the only charge or if there was also – I think you're right that there was no conspiracy to commit murder charge. I don't know if the by-card may have been conspiracy. I didn't understand it to be – so I guess my point is that in order to implicate Hodge – I'm sorry, in order to implicate Prey in the Hodge murder, the government was required to do more on these counts than to simply show that it was reasonably foreseeable to Prey that Hodge's murder would come about. They had to show that Prey was actually involved in the murder. There was other evidence showing that Prey was involved. So Prey went to speak to Lamar Larkins the night of the shooting and asked if he knew who shot him, and Larkins nodded yes. Right, which tells us that Prey could have understood what a motive for Hodge's murder could be, but it doesn't tell us that Prey was actually involved in the murder. Well, it suggests that Prey transferred that knowledge to Marlow so that Marlow could commit the murder. Is that aiding and abetting murder? If you tell someone who to kill in retribution. If you tell them who to – if you actually direct them who to kill, then I would say yeah, but if what we know is that you know who the person was, that in and of itself doesn't seem to me to be aiding and abetting murder. Something more has to happen to tie the individual to the crime. I don't understand Agent Hanna – the erroneous aspects of Agent Hanna's testimony to go to the point that Your Honor is making. Her interpreting Marlow's statement work call, Marlow's statement loafing, Marlow's statement squeak, shows nothing about whether Prey aided and abetted that murder. But it shows that it's not – I mean, I think that's – I see that's why the government was making – was eliciting the testimony. It shows that Prey is aware of the murder as it's going on. It shows that Marlow wanted to make sure that Prey was aware of it. It shows that confederacy with respect to this particular crime that, of course, this is to the government. You're right. And to the degree that the court is particularly concerned about that call, I could merely restate that we believe that – You've got several people – – loafing was 702, squeak was proper, or just factual testimony, and that all of it was harmless given that numerous other witnesses testified to the same thing, as well as the fact that the government's argument, while it did focus on this call, it focused on the ball bouncing aspect as being Prey's direction to Marlow that he could do it on his own without barking, and that's something that Agent Hanna provided no testimony about whatsoever. If the court has no other questions, I can respond to the Prey and Marlow harmlessness arguments, but there's nothing there. They murdered Crystal Washington, and Agent Hanna interpreted no calls whatsoever about that murder. There was GPS evidence showing – placing Marlow at the scene of both the Washington and the Hodge murders. There was corroboration. Benton testified that Prey told him he was going to have Marlow kill Washington. That was corroborated by the jail calls between Benton and Prey, in which Benton told Prey that Washington was in a halfway house, asked was that Zoe in court the other day, the day that Zoe came to Superior Court, to be able to see whether Washington was going to be testifying against Prey, and by the fact that Prey called Washington Wangrove, which was a character in the movie Heat, who was killed because he was cooperating. Eric McLeod was an eyewitness to the Hodge murder, and he was not a cooperator. He had an immunity letter that allowed him to say he bought drugs from Mark Prey, but he was Gerald Hodge's best friend. He saw Marlow coming around the dumpster immediately after shooting Hodge, putting a gun with an extended clip in his waistband, and testified that Marlow then said, you better not say nothing. Hodge testified that he told Hodge's uncle, Monty, that evening that he had seen Zoe kill Hodge, and then the next day one of the co-conspirators called Mark Prey to say, McLeod told E.U., which McLeod said was his nickname, told Monty some wild stuff about Zoe, thus corroborating McLeod's testimony. Polly Walker, the woman who was much farther away from that murder, who was on Stevens Road, not in the alley, corroborated all of McLeod's testimony about what he and Hodge did that day, going from E.U. to Stevens, going back to the alley, the exact directions, up the alley versus down the alley that McLeod and the murderer went after the murder. It's odd that McLeod walked away from that. I'm sorry? It's odd that McLeod walked away from that interaction. You mean that he wasn't also murdered? Mm-hmm. Given Marlow's reputation and what he was proven in this case to be, I agree with that. But it doesn't make his testimony less credible. And, in fact, the fact that he saw his best friend shot certainly suggests that. Well, no, Reynolds also testified that they saw McLeod at the scene and that McLeod walked away, right? Right. But didn't Washington? Polly Walker. Polly Walker. Who corroborated his testimony about him. What I meant by that, yeah, my question was it's odd that he wasn't killed. I agree. He's a lucky man. And, you know, the ballistics from White's trap house. Can I just ask you a theoretical question? So I thought that the defendant's arguments on these points was that the murder accounts, at least several of the murder accounts, are tied to racketeering and the conspiracy. And so if you take out this is a big if, as far as you're concerned, I get that. But if you take out counts one and two on the basis that they go south as a consequence of Hannah's testimony, then the murder in aid of racketeering necessarily comes out because everything that comes after the in aid of is out. Do you disagree with I know you disagree that we shouldn't do that because you don't think counts one and two are defective as a consequence of Hannah's testimony. But do you disagree that if counts one and two are defective as a result of Hannah's testimony, then the murder in aid of racketeering doesn't also follow. I do disagree with that, Your Honor. And I can discuss in detail the Travers testimony for the Van Johnson murder. So Van Johnson had no underlying DC murder account because it was committed in Maryland. So the only substantive charge was a bygone murder. That murder occurred in September of 2008, more than a year and four months before the wiretap in this case. And it was Travers' testimony who tied that murder to the conspiracy, who said that Cray and Bambo were like brothers. They were dealing drugs together. And that Cray murdered Van Johnson because Van Johnson was putting Bambo's life in danger. And so the fact that Agent Hannah may have improperly testified about calls that occurred 16 months later would not have affected the jury's determination as to whether or not a murder that had occurred in the past was in furtherance of the conspiracy. Where the reverse truth might be a problem because once a conspirator, always a conspirator until you withdraw from the conspiracy. But there's no danger that the jury projected backwards in time and said that because Bambo and Cray were continuing to conspire together in January of 2010, which we decide because of Hannah's calls, that means that this earlier murder was also in furtherance of the conspiracy. The jury and the parties in their argument instead focused entirely on Travers' testimony. And so for that reason, I think even if the court were to find, which it shouldn't, that Agent Hannah's testimony would cause a reversal as to Bambo's RICO conspiracy conviction, the Vicar conviction would still stand. In the aiding and abetting point that you had raised earlier, I just want to make sure I understood your response. So I'm going to say what I thought you said, and you tell me if it's wrong, which was that if there's a problem with those, that has nothing to do with Hannah's testimony. I think that's right. She didn't testify as to the meaning of any conversation. If there's a problem with those, it's kind of an insufficiency problem. That would be correct. And I don't understand that defendants have challenged the sufficiency of the substantive evidence as to that murder. Okay. I'm done. Okay. Thank you. So where are we with rebuttal time? Who has what? You all want to take rebuttal time, or just one of you? Just one? Go ahead. Okay. You can take four minutes. Thanks, Your Honor. I'm in a slightly awkward situation because much of what was talked about just doesn't involve my guy, so I'm hoping not to talk about it. But, you know, we'll see where we go. Let me start first with the harmless error conversation about the conspiracy and Mr. Benbow. And, Your Honor, I apologize for misunderstanding your question at the end of my argument. I thought you were talking about the Infiniti and not the Honda. I get my cards mixed up. I think even though there's cocaine that's associated with Mr. Benbow, and I don't mean to give up, and it's not on his person, it's in his car, I see the government's argument there. I think we've got a response, but it's still constructive. Tying cocaine to Mr. Benbow does not tie him into the conspiracy. Regrettably, there's a lot of cocaine in Washington, D.C., and just because a guy's got cocaine doesn't mean he's associated with every other cocaine dealer. That's where Agent Hanna's testimony really undercuts Counts 1 and 2, because without Agent Hanna's testimony, Mr. Benbow is not tied to the conspiracy in the enterprise that's alleged in Counts 1 and 2. You heard counsel say Travers is the key there. I did hear the testimony. I think if I were the government, I would talk about Travers a lot, too. I mean, I think what Travers does, especially around the Van Johnson shooting, is he ties Mr. Benbow to some objective facts. Well, look, if a cooperating witness is going to be effective, what the cooperating witness is going to do is take what's established and not subject to dispute and then shade it. What the Travers corroborating stuff gives you is that Mr. Benbow knew about the car in some way. I think at best it gives you accessory after the fact or some sort of involvement in the cleanup effort. And there are problems with Mr. Travers' testimony as well, right? I mean, the government stipulated to this that the Van Johnson shooting happened at 2.03 in the morning and that there was a telephone call from Mr. Benbow to Mr. Prey that started at 1.59 and it lasted for eight minutes. Now, in closing argument, the government said, well, that's just a butt dial, or we don't know what that is, but just ignore it, right? I don't think you can have an eight-minute inadvertent call. A voicemail clicks off. So this isn't a case where there's just a mountain of evidence on the government side and no evidence on Mr. Benbow's side. There is evidence on Mr. Benbow's side. There's this inexplicable call. There's no reason why Mr. Prey and Mr. Benbow would be talking on the phone if they're sitting a foot away from each other in the car, as Mr. Travers says. So his testimony is not wholly consistent with the objective evidence. And I think, you know, I said in my prior argument a lot about why I think Mr. Travers shouldn't be credited. But really, the harmless error standard should not be whenever there's one cooperating witness, that means any error is harmless. That feels, that's just too low to sort of meet the standard as we talked about in the opening argument. On the two-hatted problem, the government argued that the two-hatted just goes one way. I think when you look at Williams, that's what Williams gives you. But when you look at the reason behind Williams, I don't think that makes sense. And the reason for this is because, you know, the test is what the jury's, is jury confusion, what the jury's thinking. Here, especially on the packaging testimony, the 702, you know, sort of harmless error packaging testimony that is interpreting the call that matters to my client, less the work stuff that doesn't touch Mr. Benbow. The jury had been hearing from the government about how this is about your experience. This is in your experience working on this case. It was tied specifically to this case. And what Agent Hanna did is answering it in connection with this case, said this is how narcotics are packaged. The juror listening to that, knowing and having heard that Agent Hanna is just summarizing stuff that happened in this case, would conclude there was a bunch of other packaging that happened that is a part of this. I think it increases jury confusion, even though it's going in a different direction than what one saw in Williams. Thank you. Thank you. So we'll move on to the multiple single conspirators issue. Okay. We'll hear from Pat. May I please support? My name is Amelia Schmidt. I'm here representing Kenneth Benbow. I'll be arguing the third issue in our brief, that the government's evidence of trials reported two conspiracies and not one. The government's evidence of trials reported two conspiracies and not one. Okay. They approved at most two conspiracies, one between Kenneth Benbow and Mark Pray to distribute cocaine. Separately, a conspiracy between Pray, Mr. Marlow, and others in the Berry Farm neighborhood of southeast D.C. to distribute PCP. This means there was a fatal and prejudicial variance in the indictment because the government just couldn't show. The government alleged one conspiracy in the indictment and couldn't show it at trial. They could only show two. So I'd like to talk about that a little bit. The government's only have two. I mean, you could have two smaller conspiracies and one larger conspiracy all overlapping. I mean, these cases are often presented to us as either or. Either it was one conspiracy or smaller conspiracies. But it seems to me as if lots of times there's lots of overlapping conspiracies. As a general proposition, what's wrong with or is there anything wrong with what I just said? I don't think there's anything wrong with what you said, Your Honor, based on the cases in this circuit. I think that there are oftentimes there's evidence of overlapping participants, but there also has to be more. There has to be evidence of a shared goal, which I don't believe there was in this case. There also has to be evidence of interdependence, something that connects the different co-conspirators. In this case, the only connection that the government could show was Mark Pray. They could show that Mr. Benbow knew Mark Pray. They could show that Mr. Pray knew Mr. Marlow. But none of the testimony at trial could ever connect Mr. Benbow to Mr. Marlow, and it couldn't connect Mr. Benbow to PCP or to the Berry Farms neighborhood. There's been a lot of talk about Darryl Travers, the key cooperating witness the government got to testify against Mr. Benbow. Mr. Travers never testified about Mr. Benbow having any involvement with PCP, and he even testified that he and Mr. Benbow never sold drugs in Berry Farms. The government's star law enforcement witness, Agent Hannah, testified that she knew of no evidence linking Benbow to PCP or to the Berry Farms neighborhood. What's more, the government even said in its own closing argument of Mr. Benbow, is he a PCP guy? Maybe not. That's the Joint Appendix 2343. And yet the jury was given a verdict form. They were asked to check whether it was proven or not proven that Mr. Benbow had conspired to distribute PCP. And the jury checked it was proven. If that's not spillover prejudice, I don't see what is. When there's no evidence that can establish that he had any involvement with PCP or Berry Farms, and the jury sits through a six-week trial with 140 hours of testimony, four of which, in total, was devoted to Mr. Benbow, bringing witnesses on to testify about him. Only six of the more than 50 witnesses the government put forward even knew Mr. Benbow's name. The two assistant U.S. attorneys who were handling the grand jury proceedings and the superior court case that the government was connecting to the Crystal Washington murder, both of them testified at Mr. Benbow's trial that they never heard of him in their investigation. There were thousands of calls, which I understand my colleagues have talked about already, but at most we're talking about two that he was charged with. On the Berry Farm point, I thought the government at trial was clear that Berry Farms, obviously, a big part of the case and Locust, but that was not the entirety of the drug operation. It was not charged or proved as a Berry Farm case. Is that fair? I'm sorry, Your Honor. Is that fair? Well, I want to talk about that a little bit. So they did say that I think there were occasional nods to the fact that maybe this isn't a Berry Farms conspiracy, and they were trying to shoehorn Mr. Benbow into that narrative, but it never really made sense because they couldn't connect Benbow to anything in Berry Farms. They couldn't put Mr. Benbow in any of the drug houses that were in the Berry Farms neighborhood. Really, if you look at the way the government litigated the case, even if they didn't say it's the Berry Farm case, it really was the Berry Farm case. The opening, which was about an hour and a half, dedicated maybe about ten minutes to talking about Mr. Benbow. Otherwise, they talk about Crystal Washington, who was one of the victims in the case and was tied to one of the drug houses. They spent about two weeks of the first six weeks of that trial putting on witnesses about the Washington murder and about PCP. It's two weeks before they even start talking about Mr. Benbow or put Hannah on to testify about calls that Benbow was on. They spend a day, maybe two, on testimony about that. Then there's another three weeks where they just bring on more witnesses to testify about the Washington murder, about the Hodge murder, about PCP. It's another three weeks before anyone gets around to putting trappers on the stand or testifying about cocaine transactions. It's a long time. The jury, in the meantime- There was a lot else going on, is another way to interpret that, both in the charge conspiracy and in proving the case. I guess what matters is not how often he wasn't discussed, but how often he was discussed and what the substance of that was. He wasn't discussed hardly at all. Most of the witness testimony that came in, to the extent Counsel for Benbow at trial even had any questions to ask of most of the witnesses, they would ask, do you know who Benbow is? Most of those witnesses said no. This is a sufficiency argument, it sounds like, right? Because the instructions allow the jury to find that an individual was not a member of the overarching conspiracy if they thought that there were multiple conspiracies. I wouldn't say it's a sufficiency argument. It's really a variance argument. So under the variance standard, what we need to show is that there was substantial likelihood that the jury transferred guilt from one defendant to another. That's not quite the same as sufficiency. I do understand in some of the case law on single and multiple conspiracies, sufficiency is the governing standard. I don't think that the court has to get there. I do think, for all the reasons I've talked about, that there really wasn't evidence showing that he was in a giant narcotics conspiracy with the other defendant. But I don't think that we have to go there. I think that because of the way the government alleviated the case, there was so much in there that made the jury think, oh, well, sure, Benbow and Souk was the rest of them. You've proven the case that he knows a bad guy, Mark Craig, and that should be enough. And I think that under the CAIPA in the circuit, that's just not right. There has to be more. There has to be some sort of interdependence and a shared goal. And that doesn't prove it on this case. You mentioned interdependence? Yes, I did, Your Honor. So there's evidence in the record. There's evidence that Marlowe, according to you, he's a member of the PCP conspiracy. If you believe the evidence, we don't have to go to court. He's a member of the PCP conspiracy under your name, right? He killed Hodge in retaliation for an attack on Larkins. He's a member of the cocaine conspiracy. So that's evidence. If you believe the evidence, there's your interdependence. Well, but I don't think you can connect. You still can't connect Benbow to any of the others. I don't think that's quite enough to get there with interdependence. I mean, there was no evidence that linked Benbow at all to the Hodge murder. No, but it just has to be the conspiracies are interdependent. And here's evidence that the conspiracies are interdependent. Again, respectfully, I don't think that just Mr. Benbow having killed cocaine, if I'm understanding your argument, or if your question is, and correct me if I'm not, as I understand it, if Mr. Larkins is tied to conspiracy and he was, if you believe the evidence, the government put forward involved in the Hodge murder, that's still just not quite enough to tie Mr. Benbow to the conspiracy. That's not enough to show that Mr. Benbow was ever involved in the cocaine conspiracy. And I also believe there was even testimony on February 29th in the afternoon session, looking at page 33, lines 10 through 15, where there was testimony that there was no evidence of a Larkins and Benbow deal. Okay. Wasn't the theory that Prey is the key to the whole thing, and Benbow is obviously tight with Prey? I think to the extent that the government's arguing it's a conspiracy, it doesn't appear to be that Prey would be the hub. Everybody's selling Prey's drugs. I'm sorry? Everybody's pushing Prey's drugs, right? That's what this conspiracy is. But again, I think that's, I do think that's not enough. I think there, under Tarantino, there are a couple of different elements. They're pushing Prey's drugs. I don't think that's necessarily it. I think there was testimony at the trial that showed that some, there were some people who actually explicitly declined to deal in PCP, others who explicitly declined to deal in cocaine. And we said at the going case in our brief for reasons why that wasn't enough to show a shared goal. And I think that still goes back to the interdependence. The government never put evidence that tied Benbow to anyone else in this case other than Mark Prey. And I would even say in closing, defense counsel said, what's Mr. Benbow's real crime? He's got a friend. His friend is Mark Prey. That's the JAQ-205. I think that under the, the evidence is just so thin in this case, having bad friends is exactly what Mr. Benbow is being punished for. And that's, I don't think that that's what the law should allow. Thank you. Yes. We'll hear from the government. Thank you, Your Honor. Dan Monters again for the United States. This is a sufficiency inquiry. The jury was, the defendants say in both their opening and reply brief that the jury was not given multiple conspiracy instructions, but that's wrong. The judge granted Mr. Benbow his request to give him multiple conspiracy instructions. That instruction in written form is at JA580. In the transcript, it's JA2367-68. Mr. Benbow's entire closing argument was focused on his, I'm a member of a different conspiracy theory. And the jury, after hearing the evidence in this case, rejected that. And they appropriately rejected that. As we noted, they all shared a goal of distributing narcotics for profit and committing violent acts in furtherance of that narcotic scheme. There was ample evidence of interdependence, not just the Hodge murder, but also the Washington murder, where Washington, when she went into her own home that day, Craig gave her a dipper of PCP, and she bought crack from him.  So she would have been a witness against him in both of these alleged conspiracies. And the fact that Mr. Benbow was never seen dealing PCP as his court is aware is irrelevant. It's whether he knowingly participated with a core conspirator and achieving a common objective with knowledge of a larger venture. And there was ample evidence, given the close relationship between Benbow and Craig, that they were like brothers, because in which Craig discussed other co-conspirators with Benbow or discussed Benbow with other co-conspirators, showing that there must have been knowledge of this larger venture. And thus, the evidence was plainly sufficient to establish the sort of conspiracy charged in this case. Anything else? Okay, thank you. Thank you. Do we have any time left? Would you like a minute? Sure. Go ahead. Your Honor, I would just like to respond to a couple of points. One, on the interdependence question, again, you know, I talked about the way the government litigated the case. Brittany Brown, Ms. Washington's daughter, was also asked explicitly on cross if she'd ever heard of Mr. Benbow or if she knew him. She said no. There's nothing that tied Mr. Benbow to the Washington murder, nothing that tied him to the Hodge murder. Any of the witnesses called in the Hodge murder just didn't say anything about Kenneth Benbow. But I don't think that's enough to show that Mr. Benbow was interdependent on anyone in this conspiracy. As to ample evidence of knowledge, I understand counsel to be referring to one line from Mr. Travers that Mr. Prey and Mr. Benbow were like brothers. I think that that can't be enough to show that he knew anyone else in that conspiracy. I think that, and I would also submit that as a call, I believe the government's referring to what they say in one of their briefs with the Larkins call. I think for reasons we've stated in our briefs, that's just not enough to show interdependence in conspiracy. I believe I may be out of time. You're welcome. Thank you. Thank you. Sue, all of you, your briefs and arguments today were very helpful, and the case is submitted.
judges: Tatel, Kavanaugh, Srinivasan